IN THE UNITED STATES DISTRICT COURT
CHARLESTON DIVISION

| | |
|---|---|
| CHRISTOPHER JOHN STEC and AMOR DELADIA STEC,<br><br>PLAINTIFFS,<br><br>VS.<br><br>TRIDENT MEDICAL CENTER, LLC,<br><br>DEFENDANT. | Case No. 2:24-cv-06652-BHH<br><br><br>**COMPLAINT**<br><br>**(JURY TRIAL DEMANDED)** |

Plaintiffs above named, complaining of the Defendant, would show as follows:

## PARTIES AND JURISDICTION

1.      Plaintiffs are citizens and residents of the State of South Carolina. Plaintiff Christopher John Stec (hereinafter "Chris") and Plaintiff Amor Deladia Stec (hereinafter "Amor") are now and were at all times relevant hereto husband and wife.

2.      Defendant Trident Medical Center, LLC, (hereinafter "Hospital" or "Trident") is upon information and belief, a corporate entity formed pursuant to the laws of the State of Delaware.

## JURISDICTION and VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 because the amount in controversy as to Plaintiff exceeds $75,000.00, exclusive of interest and costs. Venue is proper in this Division as the actions complained of herein occurred in Charleston County, S.C.

4.      All pre-suit requirements for this action have been complied with. See attached Exhibit A and Exhibit B.

**FACTS**

5.      Trident is a comprehensive regional hospital facility located in the northern reaches of Charleston County and serves that area. In addition to its hospital, it has an Emergency Department that has qualified as a Level II Trauma Center. As such, it holds itself out to the public as being staffed with appropriately trained Health Care Providers including staff and physicians who are trained in caring for people in serious emergency circumstances, including the Plaintiff Chris Stec.

6.      As a comprehensive regional hospital Trident provides care for patients who are admitted through its Emergency Department, including patients who have experienced serious injuries that Trident holds itself out as being equipped to care for and providing appropriate staff to care for.

7.      As part of the business of operating this facility, Trident advertises to the public its status as a Level II Trauma Center in Charleston County.

8.      Chris brings this action for the damages that he suffered at the hands of the Defendant while a patient at Trident and being cared for by the Defendant. Amor brings this action for her damages for Loss of Consortium.

9.      Trident chose each of the physicians and staff who cared for Chris at all times relevant hereto. As such, Trident is liable for the acts and omissions of each complained of herein.

10.      Among the Health Care Providers that Trident is responsible for are the following:

    A.   Charge Nurse Doe, Manager Doe and House Supervisor Doe were at all times relevant hereto were agents, servants and employees of Defendant Trident.

    B.   All TraumaCARE & Acute Surgical Services staff including physicians, Physicians Assistants, Nurse Practitioners, and other staff members were chosen by Trident to provide care for Plaintiff Chris Stec.

11.    Trident is liable to the Plaintiffs under theories of Apparent Agency, Non-Delegable Liability and Non-Delegable Duty for the delicts in Chris's care complained of herein all as established by *Simmons v. Tuomey Reg'l Med. Ctr., 341 S.C. 32, 533 S.E.2d 312 (2000)*.

12.    Trident was at all times relevant to this action under a duty to provide to its patients the care that other Health Care Providers would so provide when caring for a patient in the same or similar circumstances. Defendant failed to do so in several particulars all as set forth hereinafter.

13.    On January 4, 2024, Chris, while in his car stopped in a line of traffic on Interstate Highway 526, was struck in the rear by another car. Chris was wearing a seatbelt and his car's airbags deployed. EMS was called to the scene. After it arrived, Chris was able to extricate himself from his car and walk to the EMS wagon and the stretcher.

14.    EMS provided care for Chris at the scene and then transported him to Trident Hospital's Emergency Department. Chris was examined by the professional

Health Care Providers there chosen by Trident and was diagnosed with multiple trauma diagnoses, including the following:

     A.   Multiple bruises and contusions over his body.
     B.   A scalp laceration that was closed with staples.
     C.   A concussion.
     D.   A fractured left elbow.
     E.   A fracture of his T4 thoracic vertebra.

15.      A radiological evaluation performed by Radiologist Nicholas C. Shaheen, MD, found a T4 fracture he described as "vertebral body without significant body height loss or retropulsion. There is no definitive posterior element fracture or involvement noted. Patient neurologically intact with 5/5 strength at all stations in the bilateral upper and lower extremities."

16.      This left Chris with very fragile support columns in his spine, and thus his spinal cord was in jeopardy if he was not provided proper care.

17.      A physical exam and review of the radiology and chart by Neurosurgeon Douglas Stofko, MD, followed. Fortunately, despite Chris's injuries and the severity of the collision, his neurological evaluation was normal. According to Dr. Stofko's note, he was "alert, oriented X 3, PERRL, normal speech, no motor deficits, no sensory deficits, 5/5 strength at all stations in the bilateral upper and lower extremities. Patient does have breakaway pain with flexion and extension of the left upper extremity, he does initiate movement with good strength."

18.      Dr. Stofko further found "no neurosurgical intervention [was] warranted at this time." He ordered that Chris be placed in a Cervical Thoracic Orthosis or CTO brace to restrict the motion of his spine and protect and prevent the nondisplaced fracture at

T4 from becoming displaced and impinging on his spinal cord. Dr. Stofko ordered that

Trident staff keep him flat in bed when he was not wearing the CTO brace.

19.     On the evening of January 4, 2024, Chris was discharged from the

Emergency Department with the above diagnoses and orders in place and transferred

to the floor in the hospital. The Attending Physicians assigned his care by Trident were

members of Trident TraumaCARE and Acute Surgical Services (hereinafter

"TraumaCARE"), its physicians, its Physicians Assistants, Nurse Practitioners and its

staff.

20.     Chris was assigned to Room 730 by Trident. Upon information and belief,

this was a two-patient room equipped with two beds. Chris was in 730B, and another

patient was in 730A.

21.     Throughout Chris's hospitalization he was seen regularly by employees of

Trident and members of the TraumaCARE team. Because of his condition, it was

especially important that his neurological condition be assessed regularly, and any

change in his neurological condition be communicated to his neurosurgeon immediately.

22.     Chris continued experiencing significant pain. The TraumaCARE team

prescribed various medications for him including CNS suppressing drugs. Among these

were Oxycodone, Fentanyl, Toradol, Robaxin, and Neurontin.

23.     Pursuant to the TraumaCARE physicians' orders, the nurses and staff

employed by Trident were to administer these CNS suppressing drugs on certain

schedules. Others employed by Trident attended Chris for Occupational Therapy and

Physical Therapy.

24.    Because of his condition, especially due to the nature of his spine fracture and the risk of displacement of that fracture into his spinal cord, Chris's risk of falls was to be monitored closely as was his neurological status.

25.    On January 9, 2024, at approximately 8am, Angela White, RN, assessed Chris's condition as "Morse Fall Scale score and risk level [was] 60 High Risk." A Neurological Assessment of his Lower Extremities was noted as "equal and strong bilaterally." His gait, strength and balance were "appropriate" and he had no "general weakness." There was no "numbness/tingling, paresis/paralysis, tremors." He was able to urinate without a catheter.

26.    In the late afternoon of January 9 Chris was administered several medications by Angela White, RN. Among them were various CNS suppressants. At 4:16pm he was given Toradol; at 4:17pm he was given both Neurontin and Robaxin.

27.    At 5:49pm the patient occupying bed A in Room 730 called the nurses' station to report Chris had fallen. When the nurse, Angela White, RN, arrived in the room to check on him, Chris reported he had been trying to call for assistance to help him get to the commode. Chris was obviously confused as Nurse White noted in the chart that the call log reflected no calls from him, but Chris reported making the calls at a time that was actually after the fall. According to Nurse White, Chris then told her "… something is making him weaker." Angela White, RN notified TraumaCARE Doe P.A.1.

28.    Ten minutes after this, at 5:59 pm, Chris was given another dose of Robaxin by Angela White, RN. This was 1 hour and 43 minutes after the 5:17pm dose.

29.    A Neuro Assessment by Paulette Ferguson, RN at 8:40pm revealed Chris's Lower Extremities were no longer equal and strong bilaterally. At 9pm he was

given Oxycodone and Neurontin by Paulette Ferguson, RN, and when presented with Robaxin Chris refused it and told her that it was "making him unable to straighten his legs."

30.     Shortly thereafter Chris needed help urinating, He was unable to do so using the urinal or the bedside commode. He was returned to his bed for a bladder scan by Nurse Ferguson which revealed an excessive amount of urine.

31.     TraumaCARE physician Travis Arnold-Lloyd, MD and/or TraumaCARE's Stephen Smith, PA were notified of this and entered an order for a straight catheter.

32.     At 10:50pm he was catheterized, and 1500 ml of urine was expressed as measured by Nurse Ferguson.

33.     After the catheterization, as Chris was being assisted from the bed back to the recliner by staff, he suffered another "fall." Nurse Ferguson notified Trauma Physician Doe 1, the Charge Nurse, the Manager, and the House Supervisor. Despite the foregoing events, Nurse Ferguson entered a note in the chart that Chris needed no higher level of care.

34.     Despite the foregoing events, for twelve hours thereafter, no further neurological assessments were performed, no orders to perform neurological assessments were entered, and no physicians came to examine Chris or assess his neurological condition for an extended period of time.

35.     On January 10th at 1:45pm, because Chris had not voided again in several hours, Nurse Angela White began a bladder scan on Chris. She then realized he was having difficulty moving his arms and legs and was confused. She notified a TraumaCARE Physician. TraumaCARE Advance Practice Nurse Nicholas Hathaway

responded. He and TraumaCARE physician Adair DeBerry-Carlisle, MD ordered radiology exams, including a CT scan. Neurosurgery was finally contacted.

36.　　The radiology workup revealed an increased displacement of the T4 vertebral fracture with retrolisthesis, a condition where the vertebra slips back towards the spinal cord, and an epidural hematoma, a swelling of the area due to trauma that causes cord compression and neurologic deficit.

37.　　Chris was operated on at 9:00 pm that evening. By that time, Chris was paralyzed from T4 down in his lower extremities. Chris underwent a decompression of the T4 fracture site to relieve the pressure on his spinal cord, the implant of posterior instrumentation with pedicle screws and rods at T2 through T6 with resulting fusion of his thoracic spine from T2 through T6, T2 through T6 posterior arthrodesis, and evacuation of the epidural hematoma. Dr. Stofko, the Neurosurgeon, performed the surgery. Dr. Stofko's note in the chart recounting the events that preceded the paralysis is enlightening.

38.　　Chris remains paralyzed and will so be for the rest of his life. Upon information and belief, but for the failure on the part of the Defendant to properly assess and attend to Chris on the afternoon and evening of January 9, 2024, and into the early afternoon of January 10, for almost twenty hours after he began to exhibit neurological compromise, he would not be paralyzed today.

39.　　Defendant itself and acting through its agents, servants and employees, as well as the persons it chose to provide care to Chris breached its duty to provide the care Chris was entitled to in the following particulars:b

     A.　In failing to provide adequately trained personnel to assist Chris and tend to his needs throughout his hospitalization.

B.  In giving Chris multiple CNS suppressants in a manner that caused him to become confused and neurologically imperiled.

C.  In failing to monitor and maintain a proper medication administration system;

D.  In failing to regularly perform Neurological Assessments in a timely and effective manner.

E.  In failing to recognize the deteriorating neurological condition Chris was experiencing, many of which are set forth hereinabove, in a timely manner so as to prevent the permanent paralysis due to the neurological injury resulting from his falls from becoming permanent.

**DAMAGES**

40.     As a direct and proximate result of the aforesaid breaches of the Standard of Care by the Defendant Chris suffered severe and permanent injuries. He is now permanently paralyzed. He has incurred in excess of $2.2 million dollars in medical expenses to date, and those expenses will continue to mount for the rest of his life. He has lost his ability to provide for himself and Amor economically. Day in and day out, Chris experiences pain constantly as well as mental anguish, decreased mobility, increased debilitation, loss of enjoyment of life, lost earnings and lost earning capacity and other damages. Chris has lost the ability to independently carry out the activities of daily living. Upon information and belief these are permanent and will continue for the remainder of his life as well as his need for ongoing medical care.

41.     Amor has suffered mental anguish, and concern for her ability to provide for her husband's needs. She has lost the full companionship, household services, and the true quality of their marital relationship.

42.    Each of the Plaintiffs is entitled to judgment against the Defendant for actual damages for each of the injuries and damages as set forth herein in an amount that is fair, just, and reasonable under the circumstances as determined by a jury, together with the costs incurred for this action.

43.    The clear and convincing evidence in this action will show that the injuries and damages Chris and Amor have experienced and will continue to experience for the rest of their lives is the result of the Defendant reckless disregard of the duties and responsibilities the Defendant owed to the Plaintiffs. Plaintiffs are entitled to punitive damages from each of the Defendant.

**WHEREFORE**, Plaintiffs pray for Judgment against the Defendant in an amount of actual and punitive damages to be determined by a jury at the trial of this matter, together with the costs and disbursements of this action.

**MARK C. TANENBAUM, P.A.**

By:    s/Mark C. Tanenbaum
        MARK C. TANENBAUM (Fed Bar # 4017)
        mark@tanenbaumlaw.com
        1156 Bowman Rd., Suite 245
        Mt. Pleasant, S.C. 29464
        Telephone: (843) 577-5100
        Facsimile: (843) 722-4688

**ATTORNEYS FOR PLAINTIFFS**

November 19, 2024